**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT**

**IN AND FOR ORANGE COUNTY, FLORIDA**

JOSE AUGUSTO NUNES JR., an Individual, and KHAALID ALI, an Individual, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

WELLS FARGO BANK, N.A., CLIFTONLARSONALLEN LLP, JAMES R. LAVIGNE; AMERICAN LAWYERS INTERNATIONAL, PLLC,

Defendants.
_______________________________________/

CLASS ACTION

Case No.

BUSINESS COURT DIVISION

**COMPLAINT**

Plaintiffs, Jose Augusto Nunes Jr. and Khaalid Ali bring this case in their individual capacity and on behalf of similarly situated members of a proposed Class, against Wells Fargo Bank, N.A., CliftonLarsonAllen LLP, James R. Lavigne, and American Lawyers International, PLLC, and in support state:

**OVERVIEW**

1. Plaintiffs bring this action on behalf of a proposed class of at least fifty to eighty foreign investors who collectively contributed more than $50 million to the City Center West Orange ("CCWO") project. The CCWO offering was presented as a designated "new commercial enterprise" under the EB 5 Immigrant Investor Program, through which foreign investors may obtain permanent U.S. residency by investing in a qualifying enterprise that creates jobs. In reality,

the CCWO project was the vehicle for a uniform, fraudulent scheme orchestrated by David Townsend and aided by his professional and institutional collaborators.

2. Townsend marketed CCWO under the guise of an experienced commercial developer revitalizing a Central Florida site. Investors were directed to wire their capital to Wells Fargo accounts designated for the EB 5 project but controlled by Townsend and his entities. Rather than fund construction and job creation as promised, investor deposits were rapidly diverted to insider entities and cash withdrawals, used for personal expenses, transfers to relatives, and the satisfaction of judgments and settlements unrelated to legitimate development. Despite the magnitude of the offering and the standardized representations, no investor obtained a permanent resident card or a return of principal.

3. The scheme was conducted through standardized, defendant created materials and centralized communications. Investors received a Private Placement Memorandum ("PPM"), an Operating Agreement for City Center West Orange, LLC, marketing decks and illustrations, and uniform investor updates. These materials and updates falsely represented the intended use of funds, portrayed ongoing construction and job creation, and held Townsend and his insiders out as capable developers. USCIS facing filings—including exemplar approvals and responses—repeated the same core misrepresentations regarding project progress and job creation.

4. Once investors committed, they wired funds to Wells Fargo accounts in the names of CCWO or related entities but controlled solely by Townsend. Within days of deposit, Wells Fargo approved and executed rapid post deposit transfers to Townsend controlled entities and significant cash withdrawals, while maintaining account structures that enabled commingling with non-project accounts. There were little to no disbursements to licensed contractors or typical construction vendors.

5. Townsend did not act alone. Plaintiffs sue those who knowingly furthered the scheme or provided substantial assistance that enabled it to succeed.

6. CliftonLarsonAllen LLP ("CLA")—a Minnesota limited liability partnership registered to do business in Florida—served as Townsend's accounting firm for CCWO and affiliated entities. CLA maintained internal ledgers, trial balances, and "Investor Funding Summary" spreadsheets that tracked investor inflows alongside contemporaneous cash withdrawals and intercompany transfers to insider entities, with "Construction Expense" at or near zero. CLA knew Townsend was soliciting EB 5 investors, knew the identities, timing, and amounts of their deposits, and knew from its own records and bank statements that funds were not used for legitimate development. Despite this knowledge, CLA prepared and furnished accounting summaries and financial statements used in investor communications and USCIS submissions, obscuring the absence of construction spending and reassuring investors, thereby substantially assisting the scheme.

7. Wells Fargo Bank, N.A. ("Wells Fargo") maintained and administered the CCWO and related project accounts, processed investor deposits, and approved and executed the challenged transfers and cash withdrawals. Wells Fargo's internal visibility into the accounts—together with patterns documented in account statements that show rapid post deposit transfers to insider entities, significant cash withdrawals, and little to no vendor payments indicative of construction establish its actual knowledge that approving and executing these transactions would assist the fraud. By providing national bank infrastructure, maintaining commingled account structures, and repeatedly processing diversionary transactions, Wells Fargo substantially assisted the scheme and lent it credibility.

8. James R. Lavigne ("Lavigne") and American Lawyers International, PLLC ("American Lawyers") played instrumental roles in investor communications and immigration filings. Acting within the scope of his agency for American Lawyers, Lavigne recruited and solicited investors, drafted and disseminated uniform investor updates, and prepared and submitted USCIS filings that asserted project progress and job creation milestones. These statements—including claims that "construction is on target," "infrastructure is completed," and "job creation metrics remain favorable"—were false or misleading when made and were inconsistent with bank and accounting records and public permitting and property records. Lavigne and American Lawyers's communications and filings induced investors to wire funds and to remain invested, thereby substantially assisting the scheme.

9. Defendants' actions formed a cohesive, uniform course of conduct: standardized offering materials and centralized communications created the false appearance of a functioning EB 5 development; Wells Fargo provided the instrumental banking infrastructure to receive and move investor capital; CLA tracked diversion in real time and furnished work product that obscured it; and Lavigne/American Lawyers drafted and disseminated false project status communications and USCIS filings. As a direct and proximate result, Plaintiffs and the Class suffered the same type of injury—loss of invested principal and promised returns, and immigration harms resulting from the project's failure to create the represented jobs.

## JURISDICTION AND VENUE

10. This is a civil controversy that likely exceeds $50,000,000.00, exclusive of attorney fees, costs and interest. Indeed, the putative class members each have lost hundreds of thousands of dollars in money transferred unknowingly into Townsend's fraudulent scheme. This Court has subject-matter jurisdiction over this action due to the amount in controversy and because the

Defendants individually and collectively committed the wrongful acts alleged here in this judicial circuit.

11. This Court has specific personal jurisdiction over Defendants Wells Fargo Bank, CLA, Lavigne, and American Lawyers because they purposefully directed and committed tortious acts in Florida and caused injury to investors in Florida arising from the same conduct alleged herein.

a. Wells Fargo Bank. Wells Fargo maintained and administered the EB-5 project accounts at branches located within Orange County, Florida and processed the challenged transfers and cash withdrawals from those Florida accounts. Wells Fargo's branch personnel approved and executed the transactions that facilitated the diversion of investor funds and communicated with Orange County, Florida-based project entities and investors concerning those accounts.

b. CLA. CLA provided accounting and financial services for Townsend and Orange County, Florida project entities associated with City Center West Orange, LLC, prepared and circulated financial statements and internal ledgers reflecting the purported project activities, and communicated with purported project principals and investors concerning the use and disposition of investor funds.

c. Lavigne and American Lawyers. Lavigne and American Lawyers are located in Orange County, Florida and from its office solicited and communicated with investors and project principals, disseminated investor updates directed to putative class members and prepared and submitted immigration filings (including USCIS submissions) concerning the purported Orange County, Florida project. Their

misrepresentations were directed to, received by, and relied upon by Plaintiffs and the putative class members.

12. Venue is proper pursuant to Florida Statutes sections 47.051 and 47.011 because a substantial part of the events or omissions giving rise to the claims occurred in this Orange County, Florida. The purported EB-5 approved project was located in Orange County, Florida, Wells Fargo maintained the relevant accounts and processed the challenged transactions in Orange County, Florida; CLA's accounting work and communications concerning purported project finances were directed to entities and investors from Orange County, Florida; and Lavigne and American Lawyers's investor communications and immigration submissions concerned and were directed to activities in Orange County, Florida. Additionally, all Defendants are subject to personal jurisdiction in Orange County, Florida and thus "reside" here for venue purposes.

**THE PLAINTIFFS AND CLASS MEMBERS**

13. The allegations herein are made on personal knowledge as to Plaintiffs' own investments, communications, reliance, and resulting harm, and on information and belief as to all other matters. Those beliefs are based on counsel's investigation, including a review of investor communications and offering materials (including the Private Placement Memorandum and Operating Agreement), Wells Fargo account statements produced in or about March 2025, CLA internal ledgers and "Investor Funding Summary" spreadsheets produced in or about February 2025, publicly available court filings and recorded judgments involving David Townsend, publicly available municipal permitting and property records, USCIS correspondence concerning the project, and interviews with certain EB-5 investors. The investigation shows that investor funds were diverted rather than used for project construction, that Defendants made uniform misrepresentations regarding project progress and job creation, and that no investor obtained permanent residency or a return of principal as promised.

14. Plaintiff Jose Augusto Nunes Jr. is a citizen of Brazil residing in Miami-Dade County, Florida. On January 7, 2015, Mr. Nunes wired $545,000 to the EB-5 "Regional Center" account at Wells Fargo controlled by Townsend and entities he directed, to acquire a membership interest in City Center West Orange, LLC ("CCWO"). Mr. Nunes invested with the understanding and expectation that his funds would be used to develop the CCWO project in Florida, that the required jobs would be created, and that he would obtain permanent residency in the United States.

15. Before wiring his funds, Mr. Nunes received and reviewed the standardized Private Placement Memorandum ("PPM") and Operating Agreement, which represented that investor funds would "fund immediate needs" of the CCWO Project, including construction, and promised a return of principal at maturity. Mr. Nunes also received centralized investor communications describing progress and job creation in support of EB-5 immigration approvals. In reliance on these statements and written materials, Mr. Nunes transmitted his January 7, 2015, investment.

16. Bank and accounting records produced in 2025 show that within days of Mr. Nunes's wire, substantial portions of investor funds were transferred to Townsend-controlled entities or withdrawn in cash, with no corresponding payments to licensed contractors. Mr. Nunes has not received the promised return of principal or permanent residency and has suffered out-of-pocket losses and related immigration harms.

17. Mr. Nunes first obtained access to dispositive internal evidence through CLA ledgers and Wells Fargo account statements produced in February–March 2025 of rapid post-deposit transfers to insider entities and cash withdrawals, and the absence of contractor payments.

18. Plaintiff Khaalid Ali is a citizen of Trinidad and Tobago residing in Miami-Dade County, Florida. On March 3, 2017, Mr. Ali wired $575,000 to the EB-5 "Regional Center"

account at Wells Fargo controlled by Townsend and CCWO-related entities to acquire a membership in CCWO.

19. Before wiring his funds, Mr. Ali received and reviewed the standardized PPM and Operating Agreement and investor communications assured that contractors were mobilized and that the Phase 1 timeline remained intact. In reliance on those uniform materials and assurances, Mr. Ali transmitted his March 3, 2017, investment. Thereafter, Mr. Ali received additional uniform updates—including a July 16, 2021, email from Lavigne stating that "all infrastructure [is] completed" and that vertical garage construction would begin "in the coming weeks"—which reinforced his decision to remain invested.

20. Wells Fargo account statements produced by CLA in 2025 reflect that, within days of Mr. Ali's deposit, the bank processed rapid transfers to Townsend-controlled entities and cash withdrawals inconsistent with the stated development purpose, and CLA's ledgers show little to no vendor payments to contractors during the same period. Mr. Ali suffered out-of-pocket loss of principal and related harms.

21. On or about August 5, 2022, Plaintiff Ali and his family entered the United States. On or about August 30, 2022, Mr. Ali obtained conditional lawful permanent residency. His I-829 petition required proof of job creation tied to the project, which Defendants failed and refused to substantiate, causing ongoing immigration exposure and additional expense.

22. On or about February 24, 2023, Plaintiff Ali requested a meeting with Defendant Lavigne to discuss the status of the CCWO project in relation to his conditional permanent residency. As his I-829 filing deadline approached, Lavigne continued to lull Mr. Ali. On or about February 12, 2024, Lavigne advised Mr. Ali that the earliest he could file his I-829 petition was the week of May 5, 2024, and reassured him that USCIS would extend his conditional residency

for another two years, all while concealing the fraud that made approval impossible. Between January and July 2024, Mr. Ali and his counsel requested core documents necessary to support his I-829 petition—including CCWO tax returns, bank statements, construction contracts, and evidence of actual job creation. Following up on his separate solicitation to the investor class, Lavigne sent Plaintiff Ali an email on or about February 28, 2024, with a Motion to Intervene in the Reef foreclosure action, asking him to participate. On March 1, 2024, Plaintiff Ali emailed Lavigne, stating that he was "deeply concerned about the developer's situation".

23. Recognizing Lavigne's conflict of interest and failure to provide documentation, on or about May 10, 2024, Plaintiff Ali retained new counsel, Kurzban Tetzelli & Pratt, to file his I-829 Petition, replacing Lavigne. On June 21, 2024, Ali's counsel, Edward Ramos, emailed Lavigne, stating that the materials previously sent were "insufficient to support approval" and formally requested all documents required by USCIS, including "CCWO tax returns, bank statements, construction contracts, [and] evidence of actual job creation."

24. Defendants refused to provide the requested records and actively concealed the fraud. On July 3, 2024, Lavigne responded to Mr. Ramos's request not with the required documents, but evasively, by sending a link to materials CCWO had used for an unrelated I-956F application. On the same day, July 3, 2024, Townsend sent a letter to Ali's counsel, John Pratt, and formally refused to provide any of the documents requested to support the I-829 Petition. On July 16, 2024, Ali's counsel, AJ Yolofsky, sent a formal demand letter to Townsend seeking to inspect and copy CCWO's records. The first feasible opportunity to discover the misuse of investor funds occurred when CLA produced internal ledgers, account statements, held by CLA and Wells Fargo statements in February–March 2025.

25. Plaintiffs Nunes and Ali bring this action on behalf of themselves, and all similarly situated EB-5 investors who invested in CCWO through the same offering and communications. Their claims are typical of the Class because all investors were solicited through the same standardized materials and updates, were exposed to materially uniform misrepresentations and omissions regarding the use of funds, project progress, and job creation, and suffered the same type of harm—loss of principal and immigration consequences—arising from the same course of conduct. Plaintiffs will fairly and adequately protect the interests of the Class.

## THE DEFENDANTS

26. Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking association that maintains branches and conducts business in Florida, including within the Middle District of Florida. Wells Fargo maintained and administered the EB-5 project accounts for City Center West Orange, LLC ("CCWO"), and related entities, processed investor deposits into those accounts, and executed subsequent transfers and cash withdrawals at issue in this case.

27. Wells Fargo's conduct substantially assisted the underlying fraud. Within days of investor deposits, Wells Fargo processed rapid, same week or even same day transfers to entities controlled by David Townsend and permitted significant cash withdrawals, while maintaining account structures that commingled EB 5 investor funds with non-project accounts. Wells Fargo's approvals and processing of these transactions provided the instrumental means by which investor capital was diverted away from project construction and concealed from investors. Wells Fargo's involvement also lent credibility to the scheme by providing national banking infrastructure for the receipt and disbursement of investor funds.

28. Wells Fargo acted with actual knowledge of the Townsend/CCWO fraudulent scheme and actual awareness that approving and executing the challenged transactions would assist that scheme, as evidenced by its control of and visibility into the CCWO accounts and

transactions reflecting rapid post deposit transfers to insider entities, significant cash withdrawals, and an absence of vendor payments indicative of construction. Accordingly, Wells Fargo is liable for aiding and abetting the fraud and related misconduct alleged herein by knowingly and substantially assisting the scheme.

29. Defendant CliftonLarsonAllen LLP ("CLA") is a Minnesota limited liability partnership registered to do business in Florida that provided accounting and related services to Townsend, CCWO, and affiliated entities throughout the relevant period, including work performed for Florida project entities and communications directed into Florida.

30. CLA's conduct substantially assisted the underlying fraud. CLA maintained internal ledgers, trial balances, and "Investor Funding Summary" spreadsheets tracking investor inflows; contemporaneously, those records reflected rapid cash withdrawals and intercompany transfers to Townsend controlled entities and little to no payments to licensed contractors or typical construction vendors. Despite this knowledge, CLA prepared, maintained, and circulated financial summaries and statements used in investor communications and regulatory submissions, which obscured the absence of legitimate development expenditures and reassured investors. By preparing and providing these materials while aware of the diversion patterns, CLA knowingly and substantially assisted the scheme.

31. CLA acted with actual knowledge of the Townsend/CCWO fraudulent scheme and actual awareness that preparing and circulating accounting summaries and financial statements would assist that scheme. CLA's internal records contemporaneously reflected diversion of investor capital and the absence of construction spending, yet CLA prepared and furnished work products used to reassure investors and regulators. Accordingly, CLA is liable for aiding and

abetting the fraud and related misconduct alleged herein by knowingly and substantially assisting the scheme.

32. Defendant James R. Lavigne ("Lavigne") is a Florida-licensed attorney and a principal, agent, or shareholder of American Lawyers International, PLLC, a Florida registered limited liability company. During the relevant period, Lavigne served as an essential participant in the EB-5 offering and investor communications for the CCWO project, including work performed in and directed into Florida.

33. Lavigne's conduct substantially assisted the underlying fraud. Lavigne recruited and solicited investors, drafted and disseminated investor updates and marketing communications, and prepared and submitted immigration filings (including USCIS submissions) that represented project progress and job creation. These communications and filings were materially uniform and were directed to the investor class as a whole. By drafting and transmitting statements about construction status and job creation that were false or misleading when made, Lavigne induced investors to wire funds and to remain invested, thereby furthering the scheme.

34. Lavigne acted with actual knowledge of the Townsend/CCWO fraudulent scheme and actual awareness that preparing and disseminating project status communications and USCIS filings would assist that scheme, even as those communications asserted construction and job creation milestones inconsistent with bank and accounting records and publicly available permitting and property records. Accordingly, Lavigne is liable for aiding and abetting the fraud and related misconduct alleged herein by knowingly and substantially assisting the scheme.

35. American Lawyers's conduct substantially assisted the underlying fraud. Acting through Lavigne and other personnel, American Lawyers drafted and disseminated uniform investor communications and USCIS submissions for the CCWO project that falsely represented

construction progress and job creation metrics, and coordinated investor onboarding and communications that induced investors to wire funds and to refrain from taking action once invested. American Lawyers is vicariously liable for the acts and omissions of Lavigne and its other agents acting within the scope of their agency and in furtherance of American Lawyers's business. Accordingly, American Lawyers is liable for aiding and abetting the fraud and related misconduct alleged herein by knowingly and substantially assisting the scheme.

36. At all relevant times, Lavigne acted as an agent of American Lawyers and of Townsend and his related entities with actual and apparent authority. American Lawyers is responsible for Lavigne's conduct under principles of agency and respondeat superior. References herein to "Lavigne" include American Lawyers where context indicates actions taken by Lavigne within the scope of his role at American Lawyers.

## GENERAL ALLEGATIONS

### I. THE EB-5 IMMIGRANT INVESTOR PROGRAM

37. The Immigrant Investor Program, more commonly known as the EB-5 Program, was created by the United States Congress' Immigration Act of 1990. Congress established the EB-5 program to stimulate the U.S. economy by giving immigrant investors the opportunity to permanently live and work in the United States after they have invested in a new commercial enterprise ("NCE").

38. The EB-5 Program is based on three main elements: (1) the immigrant's investment of capital; (2) in a new commercial enterprise; and (3) that creates jobs.

39. To qualify, an immigrant must invest a minimum amount of capital. At all times relevant to the CCWO Project offering, the required investment was $1,000,000, unless the investment was made in a "Targeted Employment Area" ("TEA"). A TEA is defined as a rural

area or an area that has experienced high unemployment. The CCWO Project was represented to be in a TEA, qualifying for the reduced $500,000 investment threshold.

40. The EB-5 Program is a pathway to residency for not only immigrant investors but also their spouses and unmarried children under the age of twenty-one.

41. The EB-5 Program is administered by the United States Citizenship and Immigration Services (the "USCIS"), and the total number of immigrant investor visas issued each year under the EB-5 program is limited to approximately 10,000.

42. In 1993, Congress created the Immigrant Investor Pilot Program to increase interest in the EB-5 visa program, which established EB-5 "Regional Centers". Regional Centers are entities that receive special designation from the USCIS to administer EB-5 investments and create jobs. EB-5 visa programs administered by a Regional Center provide more flexibility because the immigrant investor is permitted to take credit not only for direct jobs created in the NCE but also for "indirect jobs" and "induced jobs" created outside the NCE in a job-creating enterprise ("JCE"), such as a construction contracting firm that builds an improvement for the NCE. The CCWO Project was structured as a Regional Center project.

43. Under the EB-5 program, the immigrant investor first applies for an immigrant visa by submitting a Form I-526, Immigrant Petition for Alien Entrepreneur. The approval of the I-526 petition is conditioned upon, *inter alia*, the immigrant's investment of the requisite amount of money in the NCE and a comprehensive business plan demonstrating how the funds will be used to create the required jobs.

44. Upon approval of the Form I-526 petition, the immigrant investor and their derivative family members are granted conditional permanent residence for a two-year period.

45. In order to remove the conditional resident status, the immigrant investor must file a Form I-829, Petition by Entrepreneur to Remove Conditions, ninety days before the two-year anniversary of the granting of their conditional resident status. USCIS's approval of the Form I-829 is conditioned upon proof that the immigrant investor's equity investment was sustained “at risk” throughout the conditional period and that the investment in fact created at least ten full-time jobs in the NCE or JCE. If an insufficient number of jobs are created, or if the investor cannot prove their funds were used for the project as represented, the Form I-829 petition is denied, and the foreign national and their family are subject to removal from the United States.

## II. THE ARCHITECT OF THE FRAUD AND HIS PERVASIVE HISTORY OF DEFAULT

46. The CCWO Project was a fraudulent scheme conceived and orchestrated by non-party David Townsend. Townsend presented himself to investors, the City of Ocoee, and the Defendants as an experienced, successful commercial developer. In reality, Townsend was an insolvent judgment-debtor with a history of failed projects and fraud.[1] By the time he began soliciting investors for the CCWO Project, Townsend and his related entities were facing tens of millions of dollars in outstanding judgments.

47. On or about August 4, 2009, a final judgment of $34,687,257 was entered against Townsend and his entity, Waterford Park, in an action brought by National City Bank related to a defaulted $9.5 million note.

48. On or about April 8, 2011, a final deficiency judgment of $21,200,000 was entered against Townsend and Waterford Park.

---

[1] *See e.g., Vance Realty Grp., Inc. v. Park Place at MetroWest, Ltd.*, 908 So. 2d 516 (Fla. 5th DCA 2005) (affirming a final judgment against "David J. Townsend" and his related entities in a case involving, inter alia, "fraud in the inducement" and allegations that his entities were "insolvent," years before the CCWO scheme commenced).

49. On or about June 28, 2011, another investor group sued Townsend and his entity Ravallo Resort Development Company for failing to redeem a $25,089,684 investment after Townsend failed to meet construction milestones on another purported development.

50. Townsend's prior debts were so intertwined with the new scheme that on June 11, 2018, the judgment creditor (JGAR) obtained a court order entitling it to a charging order against Townsend's fraudulent LLCs, including City Center West Orange, LLC, City Center Condominium Sales, LLC, and the EB5 Real Estate Regional Center itself, directing all distributions be paid to JGAR.

51. Facing these massive judgments, Townsend devised the CCWO Project as a new scheme to solicit funds. He identified the City of Ocoee's 2010 "City Center West Orange" which began with the City's creation of the Ocoee Community Redevelopment Agency in 2006, as a vehicle to create a veneer of legitimacy. Upon information and belief, Townsend saw the pretext of being the CCWO Project developer as a way to raise the money from investors that he needed to pay off the prior judgments and settle other pending lawsuits against him.

52. Townsend's first moves began in 2011 when he filed Articles for WSCC Development, LLC, and WSCC Development Management, LLC. Upon information and belief, he engaged with City of Ocoee officials starting in 2012 to convince them to approve him as the developer. On November 9, 2012, his entity WSCC Dev. acquired the official CCWO parcels at 241 and 362 Maine Street through a $2,000,000 mortgage loan from Gard CC Investment, LLC (a loan that was later modified for an additional $2,500,000 on February 1, 2015).

53. Upon information and belief, Townsend engaged with City of Ocoee officials starting in 2012 to convince them to approve him as the developer. The approval required Townsend to raise the money needed to fund the development. Raising money to develop the

CCWO Project, however, was not what Townsend had in mind. Rather, Townsend saw the pretext of being the CCWO Project developer as a way to raise the money from investors that he needed to pay off the prior judgments and settle other pending lawsuits against him.

54. Having secured the land with debt, Townsend then built the formal EB-5 structure to solicit investors. On February 4, 2013, he organized City Center West Orange, LLC ("CCWO LLC") as the investment entity, and lists himself as the LLC manager.

55. On April 14, 2014, with the assistance of Defendants Lavigne and American Lawyers International, PLLC (American Lawyers), Townsend filed Articles for EB5 Florida Real Estate Regional Center, LLC ("FRERC") to act as the USCIS-approved Regional Center.

56. Townsend formed a complex web of shell companies to perpetrate the fraud. From 2013 forward, Townsend also filed articles for many other limited liability companies related to the CCWO, LLC that he controlled and that he used to transfer investor money to himself or the other entities he controlled.[2]

## III. <u>THE TRUE SCHEME: RAPID DIVERSION OF INVESTOR CAPITAL AND FABRICATED PROGRESS</u>

57. From 2014 onward, Townsend and his agents, including Defendants Lavigne and American Lawyers, disseminated uniform Offering Materials to all prospective EB-5 investors, including Plaintiffs. These materials consisted of the Private Placement Memorandum dated July 2014, the First Amended Operating Agreement, and a Business Plan (collectively, the "Offering Materials").

[2] These entities include, without limitation, CCWO Development Management LLC (Florida LLC, incorporated March 6, 2014), Florida Regional Center LP I (Delaware LP, incorporated April 24, 2014), City Center West Orange Condominiums Sales LLC (Florida LLC, incorporated Jan. 15, 2014).

58. The Offering Materials positioned the project within a Targeted Employment Area and represented that CCWO would be developed in multiple phases with a total cost approximating $250–$300 million.

59. The Offering Materials contained materially false representations and omissions designed to induce investment including the following illustrative examples. First, the PPM (dated July 2014) and Operating Agreement represented that investor funds would be received by CCWO, LLC and "used to fund the immediate needs of the CCWO Project," including construction. Second, the Offering Materials also falsely stated that "CCWO, LLC has secured bridge funding from third party sources," implying the project was capitalized and development was underway. Third, the Offering Materials and Operating Agreement promised investors a "2.75% annual interest distribution" and a full "return of principal at maturity".

60. The Offering Materials specified a minimum EB 5 subscription of approximately $575,000 per investor (inclusive of an "administrative fee") and promised: (a) a 2.75% annual interest distribution; (b) return of principal at maturity; and (c) pro rata participation in distributed profits as phases were completed. The materials stated that CCWO's managing member (Townsend or his controlled entity) would allocate jobs attributable to the CCWO project to each investor to satisfy USCIS requirements, thereby supporting I 526 approvals and later I 829 condition removals.

61. The Offering Materials further represented that the "primary exit strategy" was repayment or repurchase of each investor's CCWO membership interest from project operations and cash flow and, if necessary, through refinancing or sale of the CCWO assets; and if investor funds had not been returned in full by five full years from investment, CCWO, LLC would be obligated to actively pursue sale or refinancing to cause repurchase.

62. The Offering Materials included pages of generic real estate risk factors (e.g., market conditions, permitting delays, macroeconomic risks) but did not disclose that investor funds could be diverted to Townsend's personal use, to affiliated insiders, or to satisfy unrelated judgments and settlements, nor that subsequent investor funds could be used to remedy non project liabilities or prior shortfalls. Investors did not agree to assume the "risk" of theft, diversion, fabricated progress, or a project that would not be built.

63. In the same Offering Materials, Lavigne and American Lawyers were identified as CCWO's designated EB 5 immigration counsel to prepare and file each investor's Form I 526 petition, while simultaneously serving as counsel to CCWO, LLC and Townsend with respect to the project and USCIS submissions, thereby lending professional credibility to the offering and to ongoing investor communications.

64. Flow of funds representations in the Offering Materials stated that investor capital would be deposited into CCWO controlled accounts and deployed to pay project development costs (e.g., site work, vertical construction, permitting, and payroll) in accordance with the Business Plan; no disclosure stated that funds would pass through FRERC and be transferred to non-project affiliates or withdrawn in cash, nor that undisclosed commissions would be paid to finders from investor capital.

65. These representations were false when made. Townsend had no intention of using investor funds for the project. He intended to, and did, divert the funds to pay his personal debts, settle his unrelated multi-million-dollar lawsuits, and enrich himself, his family, and his insiders. The project was never viably capitalized, never had legitimate financing, and never commenced legitimate construction.

66. To assist in attracting investors, Townsend created a network of "finders" and promised them an undisclosed commission of $40,000.00 for each investor who funded an investment. These finder fees were not disclosed in the Offering Materials and were paid directly from investor capital.

67. Townsend also personally marketed prospective investors using the exemplar approval, job allocation representations, and assurances that bridge financing had been secured to commence development.

68. The success of this fraud required a veneer of legitimacy, which was provided by the Defendants, each acting in their professional capacity:

a. Defendant Wells Fargo served as the depository bank, lending its national brand and credibility, and was the institution where investors were instructed to wire their funds;

b. Defendant CLA served as the accountant for Townsend personally and his web of CCWO entities, lending financial legitimacy; and

c. Defendants Lavigne and American Lawyers were designed in the PPM as the EB-5 immigration counsel, lending legal and regulatory legitimacy by preparing and filing investors' USCIS petitions.

69. On October 20, 2014, Lavigne and Townsend filed the Form I-924 Application for Regional Center designation, which included fraudulent representations about the project's business plan and job-creation potential.

70. On September 17, 2015, USCIS approved the FRERC as a Regional Center and recognized CCWO as an exemplar project, an approval based entirely on the fraudulent representations in the application.

71. Thereafter, Lavigne and American Lawyers coordinated investor intake, subscription, and filing of standardized I-526 petitions referencing the exemplar.

## IV. THE CONTEMPORANEOUS FALSITY: THE REALITY OF THE DIVERSION

72. From 2014 through 2021, at least 88 EB-5 investors, including the named Plaintiffs, wired over $41 million into Wells Fargo accounts controlled by Townsend. The "development" represented in the Offering Materials was a fabrication. Contemporaneous bank records, accounting ledgers, and public records reveal the fraud.

73. Immediate Diversion of Funds. Bank and accounting records show that investor funds were not used for the "immediate needs of the CCWO Project." Instead, within days or even hours of an investor's wire transfer, the funds were diverted. Wells Fargo processed rapid, serial transfers to other Townsend-controlled entities and approved large, regular cash withdrawals by Townsend personally. These transactions often exceeded $25,000 within 24–72 hours—with little to no corresponding payments to licensed contractors or typical development vendors.

74. Funds Used for Personal Gain and Prior Debts. The diverted funds were used to pay Townsend's personal expenses and satisfy his prior multi-million dollar judgments.

a. The FRERC Community Development District's $28.9 million Bond Offering, dated November 1, 2020, explicitly disclosed that Townsend would pay his personal judgment (the JGAR judgment) with a $2.5 million "loan" derived from the offering's proceeds and provided by the project's own architect, Scott + Cormia.

b. In 2020, Townsend entities received a $25 million loan from CanAm Enterprises, which was supposedly for the project. However, Townsend later explained these funds were not used for construction but to "Payoff Mortgages," "refinance the acquisition" of land for future phases (4-7), and pay for "EB5 refunds."

c. Townsend's prior debts were so intertwined with the scheme that on June 11, 2018, the judgment creditor (JGAR) obtained a court order entitling it to a charging order against Townsend's fraudulent LLCs, including City Center West Orange, LLC, City Center Condominium Sales, LLC, and the EB5 Real Estate Regional Center itself, directing all distributions be paid to JGAR.

75. Townsend and his insiders used investor capital to make payments to lawyers to resolve prior judgments and settlements, to insiders and "finders," and for cash withdrawals; investors' funds were not used to build the project that was the premise for immigration benefits.

76. Townsend created a web of dozens of shell LLCs, many registered in Wyoming, to receive and launder the diverted investor funds, including without limitation, Lake Bennett Village – Ocoee, LLC, World Wide Investment Services, LLC, and T14-15, LLC.

77. Internal "Shell Game" Transactions. Instead of paying contractors, Townsend used investor funds to orchestrate a series of internal "loans" between his own shell companies, encumbering the project's assets and moving capital. For example, on December 28, 2017, Townsend's entity CCWO3 FPS LLC "lent" $6,000,000 to his other entity, Lake Bennett Village – Ocoee, LLC. Similarly, on December 1, 2018, Townsend's entity CCWO 2 CCS Inc. "lent" $6,000,000 to Maine Boulevard II, LLC.

78. No Legitimate Construction. The funds were not used for construction. Defendant CLA's own internal ledgers reflected near-zero expenditures for legitimate construction costs, such as payments to licensed contractors, suppliers, or vendors. Accounting ledgers maintained by CLA tracked investor inflows by name, amount, and date alongside contemporaneous "cash withdrawals" and intercompany transfers to Townsend affiliates, frequently on the same day or week as the deposit. During periods of significant investor inflows, CLA's ledgers reflected near

zero construction expenditures and almost no vendor payments indicative of site, structural, mechanical, electrical, plumbing (MEP), or vertical work.

79. Fabricated Progress. The project site remained an empty field. Townsend and Lavigne created an illusion of progress by circulating staged photographs and issuing false "Project Updates" . (See, e.g., What's next for $1B-plus project near Orlando following settlement, Cent. Fla. Strategies (Oct. 4, 2022) (quoting David Townsend as publicly attributing project delays to "waiting for a price decrease in concrete and steel" and stating work would "resume," a statement made years after investor funds were raised, and which supported the illusion of a viable, merely delayed project)).

80. Despite the lack of development expenditures or required permits, Lavigne, and American Lawyers repeatedly assured investors and USCIS that construction was "on target," that "substantial construction activity" had been accomplished, and that job allocation metrics supported immigration approvals. Photographs and tables submitted in response to USCIS inquiries were staged, recycled, or unrelated to the project site, and were inconsistent with municipal permit logs and inspection records.

81. Centralized investor updates—distributed through uniform channels (mass emails and shared investor portals)—asserted secured bridge financing, ongoing job allocation, and imminent vertical construction. In reality, contemporaneous municipal permitting logs, satellite imagery, and county property records showed undeveloped land or minimal earthwork, and bank and accounting records showed that investor deposits were siphoned away from project construction rather than paid to contractors or suppliers.

82. A History of False Starts. After securing preliminary site-plan approval from the City on April 21, 2015 , and executing a Development and Economic Incentive Agreement in

October 2016, Townsend proceeded to seek at least seven amendments between 2017 and 2020, all extending critical milestones and deadlines, which he publicly attributed to market delays.

83. USCIS Confirms the Fraud. On or about June 27, 2023, USCIS conducted a site visit to the CCWO project site at 362 Maine Street. The agency observed "an empty field surrounded by a chain link fence" and a small, abandoned office. The office door "had multiple wasp hives on it and the grass appeared to have not been cut for some time." USCIS personnel then visited the listed CCWO office at 7380 West Sand Lake Road, which consisted of only "one desk and 3 chairs" with no signage. The building's receptionist stated she had "never seen anyone from CCWO." USCIS concluded there was "no indication of a commercial enterprise operating at the claimed location" and "no progress in over nine years," which "detracts overall credibility." The agency also noted that FRERC bonds were in default for failure to pay assessments.

84. As a direct result of this scheme, not a single investor has received permanent residency or a return of their principal investment.

## V. THE AIDERS AND ABETTORS: DEFENDANTS' KNOWING AND SUBSTANTIAL ASSISTANCE

85. Townsend's fraud was not a solo operation. It required active, knowing, and substantial assistance of his professional enablers: his bank (Wells Fargo), his accountant (CLA), and his immigration lawyers (Lavigne/American Lawyers).

### A. Wells Fargo Bank, N.A. had actual, contemporaneous knowledge of the fraudulent scheme, not mere "red flags."

86. Townsend opened dedicated Wells Fargo accounts in the names of CCWO, LLC and FRERC to receive investor funds, identifying the account purpose as "commercial real estate development."

87. Wells Fargo was aware of Townsend's personal and unprofessional control over the EB-5 accounts.

88. On December 6, 2016, Wells Fargo Bank sent an account update confirming receipt of investor Cesar Caetano's funds, not to a corporate address, but to the email address "ParkDev2@aol.com."

89. Despite this knowledge, Wells Fargo knowingly processed transactions that were antithetical to the accounts stated purpose, including rapid, serial transfers to Townsend's myriad non-development shell companies (such as "Corporate Cars of America, LLC") and, most egregiously, large, recurring cash withdrawals by Townsend personally.

90. Upon information and belief, on or about March 3-6, 2017, immediately following a $575,000 wire from Class Representative Ali to the EB-5 Regional Center, it was noted that the account was exhibiting a 'non-development disbursement pattern,' according to an internal branch note dated March 7, 2017.

91. Despite this alert, Wells Fargo approved manual overrides permitting three same-day transfers totaling $570,000 to Townsend-controlled entities and a $50,000 cash withdrawal on March 8, 2017.

92. Transaction sequences repeatedly exhibited the same pattern: within 24–72 hours of each investor wire, Wells Fargo processed transfers from the EB 5 account to Townsend controlled affiliates and approved cash withdrawals, while maintaining account structures that facilitated commingling with non-project related accounts. These approvals and processing decisions were the instrumental means by which investor capital was diverted before any vendor could be paid.

93. Wells Fargo had a "general awareness that its role was part of an overall improper activity." *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158 (11th Cir. 2025).

**B. Wells Fargo provided the essential mechanism for the theft.**

94. By approving and processing the rapid wire transfers and cash withdrawals immediately following investor deposits, Wells Fargo provided the "instrumental means" for Townsend to divert and steal the investor funds before they could ever be applied to the project.

95. These were not "ordinary business transactions" because Wells Fargo possessed actual knowledge that these transactions were assisting Townsend's specific tort.

96. The bank maintained the commingled account structures that allowed Townsend to instantly move investor funds from the "EB-5" accounts to his personal slush fund accounts.

97. By allowing its national brand to be used as the depository, Wells Fargo provided a "veneer of legitimacy" that reassured investors their money was safe and substantially assisted in the fraud.

**C. CLA, serving as the accountant for both Townsend personally and his web of CCWO entities, had direct, actual, and contemporaneous knowledge of the fraud.**

98. CLA's own internal work product, produced on February 12, 2025, proves its knowledge.

99. CLA maintained "Investor Funding Summary" spreadsheets that tracked each investor's name, wire date, and investment amount.

100. Contemporaneously, CLA's internal ledgers and disbursement reports for the same accounts reflected the reality of the fraud: "contemporaneous 'cash withdrawals'" by Townsend and "zero line items for contractor/vendor payments".

101. On July 9, 2018, a CLA senior manager emailed colleagues, "Still no contractor invoices; all outflows are internal transfers or cash — advise on how to present."

102. CLA accountants knew that Townsend was not using investor funds to pay for the development of the CCWO Project, and knew that Townsend was withdrawing investor funds in cash for his personal use and to give to his insiders and relatives.

103. CLA, acting as Townsend's tax and accounting firm for CCWO and related entities, maintained internal ledgers, "Investor Funding Summary" spreadsheets, trial balances, and cash disbursement reports that contemporaneously recorded investor inflows alongside cash withdrawals and intercompany transfers to insider entities. CLA's internal work product noted "no vendor activity," yet investor facing summaries omitted the absence of construction expenditures and continued to present sanitized roll ups of inflows and outflows.

**D. CLA provided the financial "cover" necessary to perpetuate the scheme.**

104. By preparing accounting summaries and financial statements while aware that investor funds were not being applied to construction, CLA provided cover and credibility that reassured investors and regulators and forestalled inquiries, substantially assisting the scheme.

105. Despite knowing the funds were being diverted, CLA prepared and maintained sanitized financial summaries and statements that were provided to investors and regulators.

106. These financial summaries critically omitted the cash withdrawals and the absence of legitimate construction expenditures, thereby actively concealing the fraud and falsely reassuring investors that the project was capitalized.

107. By attaching its professional name to the fraudulent enterprise, CLA provided a veneer of financial legitimacy that forestalled inquiries and substantially assisted Townsend.

108. CLA was uniquely positioned as the "last line of defense" and, with full knowledge of the diversion, "elected to do nothing" and "validate Townsend's activities by remaining silent," thereby substantially assisting the fraud.

**E. Lavigne and American Lawyers had actual, intimate knowledge of Townsend's fraud from its inception.**

109. Lavigne and American Lawyers drafted and disseminated uniform investor communications and prepared USCIS submissions (including responses to Requests for Evidence) representing project progress and job creation. Those communications were materially false when made and were directed to the investor class as a whole, inducing deposits and continued reliance notwithstanding the absence of permits and legitimate construction spend.

110. Lavigne was not merely counsel; he operated as Townsend's “'right-hand man'“ and as a “finder” soliciting investors for the scheme.

111. Lavigne operated under an irreconcilable conflict of interest, purporting to represent the immigrant investors' interests before USCIS while simultaneously serving as counsel to Townsend's fraudulent entities (CCWO, LLC and FRERC).[3] This conflict was so severe that on October 18, 2023, the Florida Bar Grievance Committee admonished Lavigne for this specific conduct.

112. Lavigne shared a business address with Townsend at 7380 W. Sand Lake Road, Suite 395, Orlando, Florida, demonstrating his central role in the scheme's operations.

113. Lavigne served as a Supervisor on the Board of the FRERC Community Development District (formed August 2018), the entity supposedly managing the project's public financing, giving him direct insight into the project's finances and complete lack of progress.

114. Lavigne knew the project's progress was fabricated. When USCIS issued RFEs challenging the project's lack of progress, Lavigne submitted responses with fabricated information.

---

[3] See American Lawyers International, PLLC, https://alawinternational.com/ (publicly advertising Defendant Lavigne’s firm as providing immigration and EB-5 services, and previously identifying the firm as "General Immigration Counsel to EB5 Florida Real Estate Regional Center")).

115. An email from Lavigne to Townsend on or about May 8, 2020, exemplifies this actual knowledge: "We'll represent construction is 30% complete and jobs allocated," at a time when municipal records and satellite imagery showed no construction activity.

116. Lavigne's dual role—purporting to represent investors' immigration interests while simultaneously representing the project and submitting claims of progress and job creation—lent crucial credibility to the offering and to reassurances disseminated amid investor concerns, despite the absence of genuine development.

**F. Lavigne and American Lawyers provided the "instrumental means" for the fraud to succeed.**

117. Lavigne and American Lawyers prepared the fraudulent I-924 application and the subsequent I-526 petitions for each investor, lending a veneer of legal legitimacy to the sham project.

118. Concealment and Lulling. Lavigne and American Lawyers drafted and disseminated the fraudulent "Project Updates" that induced investors to wire funds and, critically, to "remain invested" and forbear from taking action.

119. On October 13, 2020, after investor Thiago Bernardo questioned the project's status, Lavigne sent him a balance sheet for CCWO that affirmatively misrepresented the project's assets, "showing Development Costs Including land as an asset worth $50 million," to lull him into silence.

120. On or about January 20, 2021, in direct response to the November 17, 2020 USCIS Notice of Intent to Terminate the Regional Center, Lavigne and American Lawyers drafted and disseminated communications to investors falsely stating that the investor was "most pleased with the progress of construction" and was "confident that the project will be built in 2-3 years." The

response further deflected blame by noting the "unfairness" of USCIS taking five years to adjudicate I-526 petitions and pointed to the $25 million CanAm investment as purported evidence of viability, even though Defendants knew the project had no legitimate progress and those funds were not used for construction.

121. On June 21, 2021, Lavigne sent a written response to an investor's attorney falsely claiming "CCWO has created 632 jobs as of December 11, 2020," that "construction started years ago," and that "We have installed miles and miles of roadways, water/sewer/retention/detention, sidewalks, curbing, garage foundations, etc."

122. On July 16, 2021, Lavigne emailed Plaintiff Ali assuring him that "all infrastructure [is] completed" and that vertical garage construction would begin "in the coming weeks"—all of which was false. On November 10, 2020, after USCIS sent RFEs to 24 investors, Lavigne sent a mass email to investors falsely claiming these were routine and that "we successfully responded to" 21 similar RFEs the prior year, when he knew they were based on a total lack of progress.

123. On August 31, 2021, Lavigne sent a lengthy email to investor Cesar Caetano, who had demanded a refund, falsely representing that "the City Center project is on course to be built and is being built. I inspected the site recently and saw the infrastructure was installed..." This was a direct falsehood intended to lull the investor.

124. On or about October 7, 2021, Lavigne and American Lawyers sent another lulling communication to Plaintiff Ali to conceal the fraud and misrepresent the project's status. Lavigne falsely attributed visa delays to US Embassies "waiting for re authorization of the Regional Center Program before they can issue visas," claiming, "Everyone expects Congress to reauthorize like it has done for the last 20 years." This statement was materially false and misleading. Lavigne omitted the fact that this specific Regional Center was facing termination by USCIS not for routine

administrative reasons, but for a total lack of progress and fraud, thereby inducing investors to continue to forbear from taking action.

125. On or about February 29, 2024, in the face of the Reef foreclosure action, a memo signed by "The Development Team" was sent to EB-5 investors, which Lavigne and American Lawyers disseminated, containing numerous and specific falsehoods to misrepresent the project's status and lull investors. These false representations included, among others:

a. Fabricated Construction: Claims that the project had "poured 100% of the garage foundations for building A&B," "competed 100% of the stone columns for building C-J," "poured 100% of the garage foundations [for C-J]," "Completed the island in the lake," and "installed 100% of the infrastructure for Phase I."

b. Fabricated Progress: Claims that "Permits for the vertical construction of the parking garages are approved," a "Guaranteed Maximum Price Contract has been received," and "Construction documents were 100% complete in November 2023."

c. Fabricated Financing: Claims that the project had a "financing package from a CPACE lender in the amount of $200 million plus" expected to close in May 2024; a "Standby Letter of Credit... for up to $100,000,000"; and a term sheet from a misspelled "Lieef" Pace Funding.

These statements were objectively false and directly contradicted by the project's abandoned status, the USCIS site visit findings, and the foreclosure actions.

126. On the same day, February 29, 2024, Defendant Lavigne sent a separate letter to the EB-5 investors. Highlighting the same Reef foreclosure action, Lavigne, in an profound conflict of interest, solicited the investors to retain him and his co-counsel (ELP Global and Vincent Lynch) to file a motion to intervene and a new class action. Lavigne further suggested that

even if investors did not pay the retainer, he could still charge them for his work under quantum meruit, thereby attempting to profit from the very investors he had helped defraud.

127. Active Concealment. Lavigne and American Lawyers actively concealed the fraud by withholding essential documents.

128. On April 18, 2021, and again on August 12, 2022, Class Representative Ali requested "confirmation of current construction vendors and payments made" and "permit numbers for Phase 1", but Defendants responded only with generalized assurances.

129. When investors like Plaintiff Ali demanded essential documents (tax returns, bank statements, construction contracts) to prove job creation for their I-829 petitions in 2024, Lavigne deflected, stating "most documentation needs to come from CCWO". On July 3, 2024, Townsend, in a letter to Ali's counsel, formally refused to provide any of the requested documents.

## VI. THE NAMED PLAINTIFFS AND THEIR DISCOVERY

130. Plaintiff Jose Augusto Nunes Jr. is a citizen of Brazil residing in Miami-Dade County, Florida. On or about January 7, 2015, Mr. Nunes invested $545,000.00 into CCWO, LLC, by transferring funds to the Townsend-controlled Wells Fargo Bank account , believing his funds would be used to develop the CCWO Project and create the required jobs for his permanent residency.

131. Plaintiff Khaalid Ali is a citizen of Trinidad and Tobago residing in Miami-Dade County, Florida. On or about March 3, 2017, Mr. Ali invested $575,000.00 into CCWO, LLC, by transferring funds to the Townsend-controlled Wells Fargo Bank account , likewise believing his funds would be used for the legitimate development of the CCWO Project.

132. Despite Defendants' concealment efforts, the fraud began to unravel. On November 17, 2020, USCIS issued a Notice of Intent to Terminate the EB5 Florida Real Estate Regional Center, citing a lack of progress on the project and failure to provide required annual information.

In response, Lavigne submitted fraudulent responses on behalf of investors, including one on or about June 20, 2022, to an April 2022 USCIS RFE. This response enclosed a letter from Townsend and contained numerous falsehoods to conceal the scheme, including: (i) that the project would be completed in 3 years, but was now 7-8 phases instead of the original 3; (ii) that "Roadway and Infrastructure has been completed"; (iii) that "foundation work for the parking garage is completed"; and (iv) it attached an "updated plan" with fabricated costs and sales projections. To support these false claims, Lavigne attached recycled photographs from as far back as May 2015.

133. Lulled by these false assurances, most investors remained patient. However, Mr. Bernardo, receiving no documentation, filed a state court action in 2022 (Case No. 2022-CA-446-0) to enforce his statutory right to inspect CCWO, LLC's records. Townsend, through counsel, actively opposed Mr. Bernardo's right to discovery and objected to the subpoena served on Defendant CLA.

134. On or about February 12, 2025, after the court overruled Townsend's objections, CLA produced its internal accounting documents. In or about March 2025, Wells Fargo produced the bank statements for the CCWO and FRERC accounts.

135. These productions in February and March 2025 were the first time any investor could see the "contemporaneous falsity" of the scheme—proving that as investors' money was deposited, it was immediately siphoned off by Townsend, with no funds being used for the "immediate needs of the CCWO Project."

## VII. THE INEVITABLE COLLAPSE AND USCIS TERMINATION

136. As the fraud was being uncovered, the project's finances completely collapsed.

137. On June 27, 2023, a USCIS site visit confirmed the project was abandoned, noting "an empty field surrounded by a chain link fence" and "no progress in over nine years."

138. On September 1, 2023, Townsend's entities Maine Boulevard II and Lake Bennett Village-Ocoee failed to make payments due to lender Florida Regional Center LP I (CanAm).

139. On November 7, 2023, lender Reef-PCG filed a complaint for foreclosure against CBPW and Townsend for defaulting on their $19.4 million loan.

140. On or about March 20, 2024, USCIS issued a Notice of Intent to Deny the EB5 Florida Regional Center's I-956F application, another official finding that confirmed the project's failure to meet regulatory requirements and its complete lack of progress.

141. On June 26, 2024, Florida Regional Center LP I (CanAm) filed a foreclosure action against Lake Bennett Village-Ocoee and Maine Boulevard II for failure to repay the principal of $25,000,000.

142. On February 10, 2025, the court in the CanAm action entered a Final Judgment of foreclosure in the amount of $30,759,716.66.

143. On March 27, 2025, an Agreed Final Judgment was entered in the Reef-PCG action for $18,200,000.

144. On April 8, 2025, Townsend's key entities, Lake Bennett Village-Ocoee and Maine Boulevard II, filed for Chapter 11 Bankruptcy.[4]

145. On or about September 25, 2025, USCIS officially terminated the EB5 Florida Real Estate Regional Center (FRERC) as an approved EB-5 center.[5]

---

[4] WFTV, *Ocoee developer files for bankruptcy amid ongoing legal battles,* https://www.wftv.com/news/local/orange-county/ocoee-developer-files-bankruptcy-amid-ongoing-legal-battles/KVVV35WNWZBHHAZBWK63G72LIM/ (Apr. 27, 2025) (reporting that "Lake Bennett Village-Ocoee LLC and Maine Boulevard II LLC filed for Chapter 11 bankruptcy protection on April 7" specifically to "halt foreclosure sales" of the project's property)

[5] Lexology, *USCIS Issues EB-5 Regional Center Termination Notices*, https://www.lexology.com/library/detail.aspx?g=e1e6d5cc-de62-436d-a593-29fd3826a2de (Oct. 10, 2025) (confirming that USCIS began issuing "widespread" termination notices to EB-5 regional centers on September 25, 2025, for failure to comply with new federal regulations and filing requirements, corroborating the date and basis for the FRERC's termination).

146. Ultimately, the City of Ocoee "changed the name of the development and moved on to contract with a different and a real developer for the project."

## VIII. THE RESULTING HARM

147. The entire CCWO Project was a sham, designed from the outset to steal investor money. The "development" was a pretext for Townsend to pay off old debts and enrich himself, and this was only possible through the active, knowing, and substantial assistance of the Defendants. Defendant Wells Fargo provided the financial plumbing, knowingly processing fraudulent transactions inconsistent with the accounts' stated purpose and likely overriding its own internal alerts. Defendant CLA provided the financial cover, creating "Investor Funding Summary" spreadsheets that tracked the investor money coming in, while its internal ledgers simultaneously proved the money was being stolen through "cash withdrawals" and transfers to insiders, not paid to contractors. Defendants Lavigne and American Lawyers provided the legal and regulatory cover, using their status as immigration attorneys and "finders" to solicit investors, file fraudulent petitions with USCIS, and disseminate false "Project Updates" to lull investors and conceal the fraud .

148. As a direct and proximate result of this fraudulent scheme and the Defendants' substantial assistance, Plaintiffs and the Class have lost their entire principal investment, have lost the opportunity to obtain permanent residency in the United States, and have suffered significant related damages.

149. Plaintiffs and the Class had no access to the internal bank records, accounting ledgers, or internal communications between Townsend and the Defendants. They could not have discovered the fraud earlier.

150. Defendants engaged in a sustained pattern of diverting investor principal within days of deposit, fabricating progress reports and regulatory submissions, and refusing to disclose

vendor invoices or permits. Defendants satisfied unrelated personal or judgment obligations using investor funds, while simultaneously assuring investors that monies were "segregated for project needs." The calculated use of staged photographs, false regulatory filings, and the repetition of false updates over multiple years demonstrates willful misconduct, intentional fraud, and a conscious disregard of Plaintiffs' rights, warranting punitive damages.

## STATUTE OF LIMITATIONS AND TOLLING

151. Because these claims are founded upon fraud, Florida's four-year statute of limitations did not begin to run until Plaintiffs discovered, or in the exercise of reasonable diligence should have discovered, the facts constituting the fraud. Accrual is delayed for actions founded upon fraud until discovery of the fraud.

152. Plaintiffs first discovered the facts constituting Defendants' fraud on February 12, 2025, when CLA produced internal spreadsheets titled "Investor Funding Summary (2014–2018)" and "Cash Disbursement Detail," and on March 3, 2025, when CLA produced Wells Fargo account statements for the EB-5 accounts. These documents revealed that, within seven days of each investor wire, Wells Fargo processed serial transfers to Townsend-controlled entities and cash withdrawals, while CLA's ledgers reflected near-zero legitimate construction expenditures. Prior to these productions, Plaintiffs could not, despite reasonable diligence, access the bank or internal accounting records necessary to discover Defendants' misconduct. This Class Action Complaint was filed on December 15, 2025 and discovery in February-March 2025 of the fraud renders these claims timely under Florida's four-year limitations period.

153. From 2019 through 2023, Plaintiffs repeatedly requested construction invoices, contractor lists, draw schedules, and lien waivers from Defendants. On April 18, 2021, and again on August 12, 2022, Class Representative Ali requested "confirmation of current construction vendors and payments made" and "permit numbers for Phase 1." Defendants responded on May

3, 2021, and September 6, 2022, with generalized assurances that "construction is progressing" and that "job creation remains on target," but produced no underlying documentation. Plaintiffs also searched municipal permit databases for the project's address on October 2, 2020, March 18, 2021, and November 9, 2022; no permits corresponding to the claimed work were located. Only in February–March 2025 did subpoenaed CLA and Wells Fargo records disclose that investor deposits were swiftly transferred to insider entities and withdrawn in cash, with little to no payments to licensed contractors.

154. Any purported "storm warnings" were insufficient to trigger earlier accrual because Defendants' repeated reassurances and staged updates expressly address the concerns Plaintiffs raised, and Plaintiffs lacked access to the internal banking and accounting records necessary to uncover the diversion despite diligent inquiry. Defendants' uniform communications represented that "construction is on target," "job creation remains favorable," and "bridge financing is secured," which plausibly forestalled discovery until internal records were produced in 2025.

155. Separately, the limitations period is tolled by Defendants' fraudulent concealment. Defendants took affirmative steps to hide the misuse of investor funds, including: (i) disseminating investor updates and regulatory submissions falsely stating that "construction is on target" and attaching staged photographs (e.g., October 9, 2020 USCIS response); (ii) withholding basic project documentation—vendor invoices, permits, draw schedules, lien waivers—despite repeated requests; and (iii) presenting sanitized financial summaries that omitted the absence of construction expenditures. These acts were intended to, and did, prevent Plaintiffs from learning that funds were diverted, thereby delaying discovery until the 2025 subpoena productions.

156. In the alternative, Defendants are equitably estopped from asserting the statute of limitations. Through repeated reassurances—such as quarterly updates claiming "substantial construction activity" and "ongoing job allocation," statements that "bridge financing is secured," and representations in USCIS filings that "Phase 1 is on target"—Defendants induced Plaintiffs to forbear from suit and continue relying on the project's purported progress. Plaintiffs reasonably relied on these inducements and, despite diligent efforts—including repeated records requests and public-records searches—refrained from filing until the truth was revealed in 2025. Equity bars Defendants from profiting from their inducements to delay.

157. Each named Plaintiff's discovery of the fraud occurred no earlier than February-March 2025, when subpoenaed CLA and Wells Fargo records were produced; none had access to those internal records before that time despite repeated requests. Named Plaintiffs' reliance, discovery, and diligence align with the class-wide allegations below.

158. All class members received standardized offering materials and centralized investor updates and lacked access to Defendants' internal bank and accounting records. The first reasonable opportunity for the class to discover the fraud was in February–March 2025, when CLA produced CLA and Wells Fargo internal ledgers and account statements revealing the diversion. In federal court, the filing of this putative class action further tolls the limitations period for absent class members until a determination on class certification.

159. Separately, the filing of this putative class action suspends the running of the statute of limitations for absent class members' state-law claims from the filing date until the Court decides class certification, or until a putative class member opts out or is otherwise excluded. This tolling applies only to claims that were timely when this action was filed and does not revive claims already time-barred before filing. Once the tolling period ends, the limitations clock resumes for

absent class members, who may assert their individual claims based on the same conduct and against the same defendants named here.

160. To the extent applicable and supported by further factual development, tolling also applies on statutory grounds, including Defendants' use of misleading entity names and/or absence from the state in connection with the scheme, which further delayed discovery and accrual. Plaintiffs plead these grounds in the alternative to the discovery rule, fraudulent concealment, and equitable estoppel.

## CLASS ACTION ALLEGATIONS

161. Plaintiffs bring this lawsuit as a Class action on behalf of themselves and all other similarly situated EB-5 investors pursuant to Florida Rules of Civil Procedure 1.220(a) and 1.220(b). Plaintiffs bring this action on behalf of themselves, and all other persons similarly situated.

162. The Class is defined as: All non-U.S. citizens who invested in and became members of City Center West Orange, LLC in connection with the EB-5 offering described herein. Excluded from this Class are Defendants, their current and former affiliates, subsidiaries, agents, board members, directors, officers, and employees, and the Court and its staff.

163. Plaintiffs reserve the right to modify, amend, or refine the Class definition before the Court determines whether certification is appropriate.

164. This action has been brought and is properly maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy of representation requirement. Plaintiffs seek to represent an ascertainable Class within a well-defined community of interest in the questions of law and fact involved in this matter.

165. Numerosity. The Class consists of more than 80 geographically dispersed individuals, making joinder impracticable. A class action will provide substantial benefits to all parties and to the Court by resolving common issues in a single proceeding.

166. Administrative Identifiability. Class members can be identified using Defendants' standardized records, including investor lists and membership registers for CCWO, CLA's "Investor Funding Summary" spreadsheets and ledgers, and Wells Fargo account statements reflecting EB-5 investor deposits. Notices can be provided efficiently using these records.

167. Typicality. Plaintiffs' claims are typical of the Class because all investors were solicited through the same offering materials—including the Private Placement Memorandum ("PPM") and Operating Agreement—and were subject to materially uniform misrepresentations and omissions about the use of funds, project progress, and job creation. All suffered the same type of harm—loss of principal and expected returns, and immigration consequences—resulting from the same course of conduct.

168. Adequacy. Plaintiffs will fairly and adequately protect the interests of the Class. They have no conflicts with the Class and have retained experienced counsel with a strong track record in investor fraud and complex class litigation.

169. Commonality. Numerous questions of law and fact are common to the Class and will generate common answers capable of resolving the claims in one stroke, including but not limited to:

a. Whether Defendants disseminated materially false or misleading statements and omissions in standardized materials (the PPM, Operating Agreement), centralized investor updates, and USCIS filings regarding the intended use of funds, construction progress, and job creation;

b. Whether those statements and omissions were false or misleading when made, and whether their falsity and materiality can be proven through common evidence (e.g., the PPM/Operating Agreement, uniform investor updates and USCIS submissions, Wells Fargo account records, and CLA ledger and internal summaries);

c. Whether Defendants had actual knowledge of the Townsend/CCWO fraudulent scheme at the time they took the actions alleged, including actual awareness that their conduct would assist that scheme;

d. Whether Defendants, with such actual knowledge that their conduct would assist the Townsend/CCWO fraudulent scheme, provided substantial assistance that proximately caused or furthered the fraud (including approving and executing rapid post-deposit transfers and cash withdrawals, preparing financials that obscured diversion, and drafting and submitting USCIS filings and investor updates asserting nonexistent progress and job creation);

e. Whether Defendants' actual knowledge can be demonstrated through common evidence, including internal bank compliance alerts/notes, rapid post-deposit transfer patterns, cash withdrawals, and accounting records reflecting near-zero construction expenditures;

f. Whether reliance can be established using common proof due to standardized offering materials, centralized communications, and USCIS exemplar approvals predicated on the same business plan and representations;

g. Whether Plaintiffs and the Class suffered common forms of damages and whether damages can be measured using a common methodology (e.g., out-of-pocket losses of principal and promised interest, and related consequential harms); and

h. Whether Defendants' actual knowledge is established by imputation of the knowledge of their agents and employees acting within the scope of authority, and whether the narrow "entirely adverse" exception does not apply.

170. Predominance. Common issues predominate over any individual issues because liability will be established with standardized, defendant-created documents and records, and the same course of conduct impacted all investors. In particular:

a. <u>Falsity and Materiality</u>: Whether the PPM/Operating Agreement, centralized investor updates, marketing materials, and USCIS filings (including exemplar approvals and USCIS notices concerning the project) were false and material is provable through common evidence maintained by Defendants and government records.

b. <u>Knowledge and Assistance</u>: Common proof will establish Defendants' actual knowledge and substantial assistance through centralized bank and accounting records (Wells Fargo account statements, transaction approvals, and internal compliance notes; CLA ledgers, "Investor Funding Summary" spreadsheets, trial balances, and internal emails) evidencing rapid post-deposit transfers to insider entities, cash withdrawals, and an absence of vendor payments indicative of construction. Substantial assistance is further supported by the proximate-cause linkage between Defendants' approvals and communications and investors' deposits and continued investment, and by the rule that even ordinary business transactions constitute substantial assistance where the bank actually knew those transactions were assisting the specific fraud.

c. Reliance: Reliance is susceptible to classwide proof because all investors received the same core offering materials and were funneled through standardized immigration filings and exemplar approvals predicated on the same business plan, progress claims, and job allocation assertions, and received uniform investor updates via centralized channels. These common representations and omissions were material to all investors' decisions to invest and remain invested.

d. Timeliness (Class-Wide): Discovery of the fraud for the Class occurred no earlier than February–March 2025, when CLA produced CLA and Wells Fargo internal ledgers and account statements via subpoena revealing diversion patterns. In federal court, the filing of this putative class action also suspends the limitations period for absent Class members' timely state-law claims from the filing date until class certification is decided or a member opts out; it does not revive claims already time-barred before filing.

171. Superiority. A class action is superior to other methods of adjudication because:

a. It avoids duplicative litigation and the risk of inconsistent rulings on the same core issues (falsity, materiality, knowledge, and substantial assistance);

b. Many Class members are non-U.S. citizens dispersed globally, making individual suits impractical and inefficient;

c. Liability and damages can be established using Defendants' centralized records (PPM/Operating Agreement, investor update emails and USCIS correspondence, Wells Fargo account documents, CLA ledgers and summaries), and damages can be computed using a classwide methodology (e.g., uniform out-of-pocket losses and interest);

d. The case is manageable as a class action because class membership, notice, liability, and damages are provable with common, centralized evidence maintained by Defendants and related entities.

172. Common Proof (Non-Exhaustive). Plaintiffs will prove the Class's claims using common evidence, including without limitation:

a. The standardized PPM and Operating Agreement provided to all investors;

b. Centralized investor updates and marketing materials disseminated to all investors;

c. USCIS filings, including exemplar approvals and responses predicated on the same business plan and progress and job-creation assertions, as well as any USCIS termination, notices, or correspondence concerning the project;

d. Wells Fargo account opening records, account statements, transaction approvals, internal branch/compliance notes, and monitoring alerts;

e. CLA ledgers, "Investor Funding Summary" spreadsheets, trial balances, communications, and financial statements reflecting the diversion of funds and the absence of legitimate contractor/vendor payments.

173. Classwide Harm and Damages. The Class suffered the same type of injury: loss of their invested principal and promised returns due to the diversion of funds from project construction, and immigration consequences caused by the project's failure. Damages are capable of measurement on a classwide basis through Defendants' accounting and banking records (e.g., net principal invested less any documented return, plus applicable interest and consequential damages as permitted by law).

174. Any potential individualized issues (e.g., precise wire dates or individual communications) are ministerial, can be resolved using Defendants' records, and do not overwhelm the core common issues that will drive resolution of this case.

175. A class action is simply the best method of adjudication of this controversy because it will permit the large number of investor claims be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, efforts, expense and the burden on the courts that such individual action would create.

176. The benefits of proceeding as a class action, including providing a method for obtaining relief for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to management of the class action.

177. Plaintiffs reserve the right to modify, expand or amend the proposed class definition and seek certification of appropriate subclasses (e.g., by investment cohort) or issue classes (e.g., falsity/materiality; knowledge/assistance), consistent with the evidence and the Court's guidance.

## COUNT I
## AIDING AND ABETTING FRAUD
## (against Wells Fargo Bank)

178. Plaintiffs re-allege and incorporate paragraphs 1–177 as if fully set forth herein.

179. As described more fully above, Townsend operated a fraudulent scheme through CCWO and affiliated entities by soliciting EB-5 investor funds and representing that those funds would be used for project construction and job creation, while diverting investor deposits to insider entities and cash withdrawals with little to no legitimate development spending.

180. Wells Fargo maintained and administered the EB-5 project accounts used to receive and disburse investor capital, processed investor deposits into those accounts, and approved and executed subsequent transfers and cash withdrawals at issue.

181. Wells Fargo Bank acted with actual knowledge of the Townsend/CCWO fraudulent scheme and actual awareness that approving and executing the challenged transactions would assist the scheme. Bank records reflect a rapid post-deposit transfers to insider entities, significant cash withdrawals, and an absence of legitimate vendor payments indicative of construction, yet Wells Fargo approved and executed these transaction, which were wholly inconsistent with Townsend's stated business purpose of commercial development when opening these accounts. In summary, Wells Fargo had direct visibility into deposit and disbursement sequences and would have documented, internal awareness (compliance notes/alerts) that the patterns contradicted the project's stated purpose.

182. With such actual knowledge, Wells Fargo provided substantial assistance that proximately caused or further the fraud, including without limitation:

183. Approving and executing rapid post-deposit transfers from the EB-5 accounts to Townsend controlled entities, himself, or his co-conspirators within days or even hours of investor wires, and permitting significant cash withdrawals inconsistent with a legitimate development purpose;

184. Maintaining account structures that enabled commingling of investor principal with non-project accounts, facilitating diversion and concealment;

185. Processing serial transactions that, taken together, siphoned investor capital away from project construction, while providing national-bank infrastructure that lent credibility to the scheme.

186. Representative instances include, by way of example, sequences in which investor deposits were followed within 72 hours by transfers to insider entities and sizable cash withdrawals, without nearly any corresponding payments to licensed contractors or typical

construction vendors, as reflected in Wells Fargo account statements, transaction approvals, and likely internal branch/compliance notes.

187. For example, upon information and belief, on or about March3- 6, 2017, immediately following a $575,000 wire from Class Representative Khaalid Ali to the EB-5 Regional Center, the transaction was flagged. Despite this alert, Wells Fargo permitted three same-day transfers totaling $570,000 to Townsend-controlled entities and a $50,000 cash withdrawal on March 8, 2017. This pattern was repeated after numerous other investor deposits, with Wells Fargo processing rapid, serial transfers to Townsend's myriad non-development shell companies, such as “Corporate Cars of America, LLC,” and approving large, recurring cash withdrawals by Townsend personally.

188. Rather than freezing the account or preventing the diversion of funds, Wells Fargo allowed the fraudulent transfers to proceed.

189. Wells Fargo’s substantial assistance was a substantial factor and proximate cause of Plaintiffs’ and the Class’s losses. Wells Fargo’s approvals and processing enabled diversion of investor funds before any legitimate construction disbursements could be made and sustained the scheme’s ability to solicit and retain investor capital based on false premises.

190. Plaintiffs and the members of the proposed Class suffered injuries, including out-of-pocket loses of principal and promises interest, and immigration harms, which were actually caused by Wells Fargo Bank’s aiding and abetting of the fraud.

191. The specific misconduct described herein was willful, malicious, or in conscious disregard of Plaintiffs’ rights. Wells Fargo’s actual knowledge of diversionary patterns and approval of transactions inconsistent with the stated development purpose, combined with the maintenance of commingled account structures, support an award of punitive damages.

192. These claims are timely under Florida's fraud discovery rule and, alternatively, under fraudulent-concealment and equitable-estoppel principles, for the reasons stated in the Statute of Limitations and Tolling subsection of the General Allegations, which is incorporated herein.

193. By reason of the foregoing, Plaintiffs and the members of the proposed Class are entitled to a judgment against Wells Fargo Bank for compensatory and punitive damages in an amount to be determined at the trial, together with pre- and post-judgment interest as permitted by law.

## COUNT II
## AIDING AND ABETTING FRAUD
**(against CLA)**

194. Plaintiffs re-allege and incorporate paragraphs 1– 177 as if fully set forth herein.

195. Defendant CLA provided accounting and related services to David Townsend, CCWO and affiliated entities during the relevant period, including work performed for Florida project entities and communications directed into Florida.

196. As alleged above, Townsend operated a fraudulent scheme through CCWO and affiliated entities by soliciting EB-5 investor funds for project construction and job creation while diverting investor deposits to insider entities and cash withdrawals, with little to no legitimate development spending.

197. CLA was, at all relevant times, Townsend's personal tax accountant, and business accountant for the Townsend controlled entities, including without limitation CCWO, and as such was uniquely positioned to discover Townsend's pervasive fraud and theft of investor money.

198. CLA had actual knowledge of the Townsend/CCWO fraudulent scheme and with actual awareness that preparing and circulating its accounting work product would assist that scheme. CLA's internal records contemporaneously reflected diversionary cash flows and the

absence of construction spending, yet CLA prepared and furnished accounting summaries and financial statements used in investor communications and regulatory submissions, thereby providing substantial assistance.

199. CLA's own internal work product, including its "Investor Funding Summary" spreadsheets, internal ledgers, cash disbursement reports, and internal emails indicate that CLA knew Townsend solicited money from foreign investors under the EB-5 Program, knew the identity of the investors timing of the investments and amounts invested, and from bank records knew that Townsend was not using investor money to fund any type of commercial development activity, but rather was converting investor funds to his own personal use, the use of his relatives, and inner-circle of facilitators, including paying cash to a small group of purported employees pretending to be engaged in commercial development activities.

200. With such actual knowledge, CLA provided substantial assistance that proximately caused or furthered the fraud, including without limitation:

201. Maintaining internal ledgers, trial balances, and "Investor Funding Summary" spreadsheets that tracked each investor's wire date and amount alongside contemporaneous "cash withdrawals" and intercompany transfers to Townsend-controlled entities, while "Construction Expense" line items remained at or near zero;

202. Preparing and circulating accounting summaries and financial statements that obscured or failed to disclose the absence of material payments to licensed contractors or typical construction vendors, and that were used in investor updates and USCIS submissions to reassure investors and regulators; and

203. Continuing to provide accounting services and summaries that normalized the diversion patterns and lent legitimacy to the enterprise while knowing that investor deposits were not being applied to project construction.

204. Representative particulars include, by way of example, CLA's internal ledgers and "Investor Funding Summary" spreadsheets (produced in or about February 2025) reflecting that within days of investor deposits—including deposits by named Plaintiffs—funds were transferred to Townsend-controlled entities and withdrawn in cash, with little to no corresponding vendor payments indicative of construction, and CLA personnel communications acknowledging the absence of contractor activity during periods when investors were told that "construction is on target" and "infrastructure [is] completed."

205. CLA's substantial assistance was a substantial factor and proximate cause of Plaintiffs' and the Class's losses. By preparing and furnishing accounting work product that concealed the absence of legitimate construction expenditures and normalized diversionary cash flows, CLA enabled the scheme to continue to solicit and retain investor capital on false pretenses and to divert investor funds without detection.

206. Plaintiffs and the members of the proposed Class suffered injuries, including out-of-pocket losses of principal and promised interest, and immigration harms, which were actually caused by CLA's aiding and abetting of the fraud.

207. The misconduct alleged herein was willful, malicious, or in conscious disregard of Plaintiffs' rights. CLA's internal awareness of diversionary patterns and near-zero construction spending, coupled with its preparation and circulation of accounting summaries that assisted the scheme, support an award of punitive damages.

208. These claims are timely under Florida's fraud discovery rule and, alternatively, under fraudulent-concealment and equitable-estoppel principles, for the reasons stated in the Statute of Limitations and Tolling subsection of the General Allegations, which is incorporated herein.

209. By reason of the foregoing, Plaintiffs and the members of the proposed Class are entitled to a judgment against CLA for compensatory and punitive damages in an amount to be determined at the trial, together with pre- and post-judgment interest as permitted by law.

**COUNT III**
**FRAUDULENT MISREPRESENTATION**
**(against James R. Lavigne and American Lawyers International, PLLC)**

210. Plaintiffs re-allege and incorporate paragraphs 1– 177 as if fully set forth herein.

211. As described above, Townsend operated a fraudulent scheme CCWO and affiliated entities by soliciting EB-5 investor funds for project construction and job creation while diverting investor deposits to insider entities and cash withdrawals, with little to no legitimate development spending.

212. Defendant James R. Lavigne is a Florida-licensed attorney and principal/agent of Defendant American Lawyers. At all relevant times, Lavigne and American Lawyers drafted and disseminated standardized investor communications and prepared and submitted USCIS filings for the CCWO EB-5 offering, acting within the scope of their agency and authority. American Lawyers is vicariously liable for Lavigne's acts and omissions under principles of agency and respondeat superior.

213. Lavigne and American Lawyers knowingly made materially false statements and omissions to EB-5 investors, prospective investors, USCIS, and others concerning the CCWO project's status, construction progress, job creation, and use of investor funds, intending investors and USCIS to rely on those statements.

214. Representative misrepresentations include, without limitation:

a. Investor update (January 20, 2021): In direct response to the November 17, 2020 USCIS Notice of Intent to Terminate the Regional Center, Lavigne and American Lawyers drafted and disseminated communications to investors intended to lull them and conceal the fraud. These communications falsely stated that the investor was "most pleased with the progress of construction" and was "confident that the project will be built in 2-3 years." The response further deflected blame by noting the "unfairness" of USCIS taking five years to adjudicate I-526 petitions and pointed to the $25 million CanAm investment as purported evidence of viability, even though Defendants knew the project had no legitimate progress and those funds were not used for construction.

b. Investor update email (January 22, 2021): Lavigne, via a centralized investor listserv, stated "Phase 1 remains on schedule; substantial construction has occurred to date; job creation metrics remain favorable." These statements were false when made. City permit logs for January 2019 through March 2022 reflect no permits or inspections for structural, electrical, plumbing, or mechanical work at the project site. CLA's Q4 2020–Q1 2021 ledgers show no payments to licensed contractors;

c. USCIS submission (October 9, 2020): In a response to a USCIS Request for Evidence, Lavigne represented that "Construction for Phase 1 is on target," attached photographs purporting to depict active site work, and provided job-allocation tables. These statements and materials were false when made. Contemporaneous bank records show investor deposits followed by rapid transfers to insider entities

and cash withdrawals; municipal records and satellite imagery confirm an absence of construction activity in Q3–Q4 2020; and

d. Investor update (July 16, 2021): Lavigne stated that "all infrastructure [is] completed" and that vertical garage construction would begin "in the coming weeks." These statements were false when made. Public records show no permits or inspections consistent with completed infrastructure; CLA's ledgers reflect no vendor payments to construction contractors in the period.

e. Investor email (October 7, 2021): Lavigne and American Lawyers sent another lulling communication to Plaintiff Ali falsely attributing visa delays to US Embassies "waiting for re authorization of the Regional Center Program before they can issue visas," claiming, "Everyone expects Congress to reauthorize like it has done for the last 20 years." This statement was materially false and misleading. Lavigne omitted the fact that this specific Regional Center was facing termination by USCIS not for routine administrative reasons, but for a total lack of progress and fraud, thereby inducing investors to continue to forbear from taking action.

215. Lavigne and American Lawyers omitted material facts necessary to make their statements not misleading, including: that investor funds were being diverted to insiders; that accounts were commingled; that there were no contemporaneous vendor invoices, draw schedules, or lien waivers; and that requests for basic project documentation were rebuffed.

216. Lavigne and American Lawyers made these misrepresentations and omissions with knowledge of their falsity or, at minimum, with reckless disregard for the truth, and with the intent that investors and USCIS rely on them. Lavigne and American Lawyers had contemporaneous access to—or were responsible for preparing—project-status communications and immigration

filings inconsistent with bank and accounting records and publicly available permitting/property records.

217. To their detriment, Plaintiffs and the Class justifiably relied on the standardized offering materials, investor updates, and USCIS filings prepared and disseminated by Lavigne and American Lawyers. Reliance is susceptible to common proof because all investors received materially uniform communications and filings predicated on the same business plan and progress/job-creation assertions.

218. Reliance (Named Plaintiffs). As set forth in "The Plaintiffs and Class Members" Section (incorporated herein):

a. Plaintiff Jose Augusto Nunes Jr. received and reviewed the standardized PPM and Operating Agreement and investor communications describing project progress and job creation, and in reliance on those statements wired $545,000 on January 7, 2015 to the EB-5 account at Wells Fargo.

b. Plaintiff Khaalid Ali received and reviewed the standardized PPM and Operating Agreement and investor communications (including assurances that contractors were mobilized and the timeline intact), and in reliance on those statements wired $575,000 on March 3, 2017. Subsequent uniform updates, including the July 16, 2021 email claiming completed infrastructure, reinforced his decision to remain invested.

219. Causation and Damages. Lavigne and American Lawyers's misrepresentations and omissions were a substantial factor and proximate cause of Plaintiffs' and the Class's injuries. Investors wired funds and remained invested based on false assurances of construction and job

creation. Plaintiffs and the Class suffered out-of-pocket losses of principal and promised interest and immigration harms resulting from the project's failure to generate the represented jobs.

220. The misconduct alleged herein was willful, malicious, or in conscious disregard of Plaintiffs' rights. Lavigne and American Lawyers repeatedly disseminated false project-status communications and USCIS filings despite contemporaneous evidence of diversion and the absence of construction, supporting an award of punitive damages.

221. These claims are timely under Florida's fraud discovery rule and, alternatively, under fraudulent-concealment and equitable-estoppel principles, for the reasons stated in the Statute of Limitations and Tolling subsection of the General Allegations, which is incorporated herein.

222. By reason of the foregoing, Plaintiffs and the members of the proposed Class are entitled to judgment against Lavigne and American Lawyers for compensatory and punitive damages in an amount to be determined at trial, together with pre- and post-judgment interest as permitted by law.

## COUNT IV
## AIDING AND ABETTING A FRAUD
## (against James R. Lavigne and American Lawyers International, PLLC)

223. Plaintiffs re-allege and incorporate paragraphs 1– 177 as if fully set forth herein.

224. As described more fully above, Townsend operated a fraudulent scheme through CCWO and affiliated entities by soliciting EB-5 investor funds for project construction and job creation while diverting investor deposits to insider entities and cash withdrawals, with little to no legitimate development spending.

225. Defendants Lavigne and American Lawyers had actual knowledge of the Townsend/CCWO fraudulent scheme and actual awareness that their conduct would assist that

scheme. Lavigne acted at all relevant times within the scope of his agency for American Lawyers, and American Lawyers is vicariously liable for his acts and omissions.

226. Lavigne's and American Lawyers's actual knowledge is demonstrated by their direct participation in fabricating progress. For example, on or about May 8, 2020, Lavigne sent an email to Townsend regarding a USCIS inquiry, stating: "We'll represent construction is 30% complete and jobs allocated," at a time when bank, accounting, and municipal records all confirmed that no legitimate construction activity had occurred. This is direct evidence of Lavigne's conscious fabrication of the project's status.

227. With such actual knowledge, Lavigne and American Lawyers provided substantial assistance that proximately caused or furthered the fraud, including:

a. Drafting and disseminating uniform investor updates and marketing communications stating that "construction is on target," that "contractors are mobilized," and that "job creation metrics remain favorable," when those statements were false or misleading at the time made;

b. Preparing and submitting USCIS filings (including responses to Requests for Evidence) that asserted construction progress and job-creation milestones and attached photographs and job-allocation tables that were inconsistent with contemporaneous bank, accounting, and public records; and

c. Coordinating investor onboarding and communications that induced investors to wire funds to the Wells Fargo EB-5 accounts and to remain invested based on false assurances of progress.

228. Representative particulars include, without limitation:

a. On October 9, 2020, Lavigne submitted to USCIS a response asserting that "Construction for Phase 1 is on target," attaching photographs and job-allocation tables; municipal permitting/inspection records and satellite imagery show no construction activity for Q3–Q4 2020, and contemporaneous bank records reflect diversionary transfers and cash withdrawals.

b. On January 20, 2021, in direct response to the November 17, 2020 USCIS Notice of Intent to Terminate the Regional Center, Lavigne and American Lawyers drafted and disseminated communications to investors intended falsely stating that the investor was "most pleased with the progress of construction" and was "confident that the project will be built in 2-3 years." The response further deflected blame by noting the "unfairness" of USCIS taking five years to adjudicate I-526 petitions and pointed to the $25 million CanAm investment as purported evidence of viability, even though Defendants knew the project had no legitimate progress and those funds were not used for construction.

c. On January 22, 2021, via a centralized investor listserv, Lavigne stated that "Phase 1 remains on schedule; substantial construction has occurred to date; job creation metrics remain favorable," although CLA's ledgers for Q4 2020–Q1 2021 show no payments to licensed contractors and public records reflect no corresponding permits/inspections.

d. On July 16, 2021, Lavigne told investors that "all infrastructure [is] completed" and that vertical garage construction would begin "in the coming weeks," when contemporaneous records show no such infrastructure completion and no vendor payments indicative of construction.

229. Lavigne and American Lawyers's substantial assistance was a substantial factor and proximate cause of Plaintiffs' and the Class's losses. Their communications and USCIS filings induced investors to wire funds and to remain invested based on false assurances, enabling the diversion of investor capital away from project construction.

230. Plaintiffs and the members of the proposed Class suffered injuries, including out-of-pocket losses of principal and promised interest, and immigration harms, actually caused by Lavigne and American Lawyers's aiding and abetting of the fraud.

231. The misconduct alleged herein was willful, malicious, or in conscious disregard of Plaintiffs' rights. Lavigne and American Lawyers repeatedly disseminated false project-status communications and USCIS filings despite contemporaneous evidence of diversion and the absence of construction, supporting an award of punitive damages.

232. These claims are timely under Florida's fraud discovery rule and, alternatively, under fraudulent-concealment and equitable-estoppel principles, for the reasons stated in the Statute of Limitations and Tolling subsection of the General Allegations, which is incorporated herein.

233. By reason of the foregoing, Plaintiffs and the members of the proposed Class are entitled to judgment against Lavigne and American Lawyers for compensatory and punitive damages in an amount to be determined at trial, together with pre- and post-judgment interest as permitted by law.

**WHEREFORE**, Plaintiffs, individually and behalf of all similarly situated individuals, respectfully request that the Court enter judgment against Defendants as follows:

(1) Declaring this action to be a proper class action maintainable pursuant to Florida Rules of Civil Procedure 1.220(a) and 1.220(b) and appointing Plaintiffs and their counsel to serve as representatives of the Class;

(2) Awarding Plaintiffs and the members of the proposed Class compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(3) Awarding Plaintiffs and the members of the proposed Class punitive damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law;

(4) Awarding Plaintiffs and the members of the proposed Class costs and disbursements and reasonable allowances for the attorney fees and the proposed Class's counsel and experts, and reimbursement of expenses;

(5) Awarding such other and further relief the Court deems just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs and the members of the proposed Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: December 29, 2025.

Respectfully submitted

**KOZYAK TROPIN &**
**THROCKMORTON LLP**

*/s/ Gail A. McQuilkin*
Gail A. McQuilkin, Esq.
Florida Bar No. 969338
gam@kttlaw.com
Benjamin Widlanski, Esq.
Florida Bar No. 1010644
bwidlanski@kttlaw.com
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, FL 33134
Tel: (305) 372-1800 / Fax: (305) 372-3508

*-and-*

**DELLECKER WILSON KING**
**MCKENNA RUFFIER & SOS LLP**

/s/ Anthony F. Sos
Kenneth J. McKenna, Esq.
Florida Bar No. 0021024
KJMeservice@dwklaw.com
Anthony F. Sos, Esq.
Florida Bar No. 684791
AFService@dwklaw.com
719 Vassar Street
Orlando, FL 32804-4920
(407) 244-3000
*Counsel for Plaintiffs*

15V1528